UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. |
| JAMES SINISCALCHI, | ) ) | JURY TRIAL DEMANDED |
| Defendant. | ) ) ) | |

## **COMPLAINT**

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following against Defendant James Siniscalchi ("Siniscalchi").

## **SUMMARY**

1.      This is a securities fraud enforcement action.  Siniscalchi engaged in a scheme to defraud investors between approximately May 2017 and at least mid-2018.  Starting no later than May 2017 and continuing through at least December 2017, Company A and its affiliated investment funds fraudulently raised a net amount of at least approximately $2.7 million from at least 12 investors.  Company A, through Siniscalchi—Company A's Chief Compliance Officer—falsely represented to investors that their money would be exclusively used to purchase certain show tickets, which Company A intended to resell at a profit.  In reality, Siniscalchi knowingly misused investor assets for the benefit of himself and his extended family. Thereafter, through at least mid-2018, Siniscalchi schemed to conceal his conduct from Company A's investors.

2.      As a result of the conduct alleged herein, Siniscalchi violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act of 1933

("Securities Act"), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act")
and Rules 10b-5(a) and (c) thereunder.

3.      The Commission seeks a permanent injunction enjoining Siniscalchi from
engaging in the transactions, acts, practices, and courses of business alleged in this Complaint,
disgorgement of all ill-gotten gains from the unlawful conduct set forth herein together with
prejudgment interest, civil penalties, and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to Section 22(a) of the
Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act
[15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

5.      Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C.
§ 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the acts, practices,
transactions and courses of business alleged in this Complaint occurred within the Southern
District of New York, and were effected, directly or indirectly, by making use of means or
instrumentalities of transportation or communication in interstate commerce, or the mails.
Among other things, Siniscalchi resides in this district.

## THE DEFENDANT

6.      James Siniscalchi, age 46, lives in New York, New York.  Siniscalchi is the first
cousin of Joseph Meli.  During the time period of the conduct alleged herein, Siniscalchi was the
Chief Compliance Officer of Company A.

## RELATED PARTIES

7.      Joseph Meli ("Meli"), age 44, is presently serving a 78-month federal prison
sentence in connection with his conviction by guilty plea in *United States v. Joseph Meli, et al.*,
17-cr-127 (S.D.N.Y.).  In that case, as well as in two related Commission actions—*SEC v.*

*Joseph Meli, et al.*, 17-cv-632 (S.D.N.Y.) and *SEC v. Craig H. Carton, et al.*, 17-cv-6764 (S.D.N.Y.)—Meli and several entities under his control were charged with operating schemes in which Meli misappropriated investor funds after representing that investors' money would be used to buy and resell large blocks of tickets to Broadway shows and concerts.  Before reporting to prison in June 2018, Meli lived with his wife and their children in New York, New York.

8.      Company A is a Delaware limited liability company formed in May 2017 with a principal place of business in Santa Monica, California.  Company A is indirectly (each through an entity) 50-50 owned by two individuals, referred to herein as Company A's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), respectively.  The CEO and CFO were both authorized co-signers on some Company A bank accounts, while for other Company A accounts the CFO was the sole authorized signer.  Company A Fund LLC and Company A Fund I LLC (collectively, the "Company A Investment Funds") are investment funds related to Company A.

## FACTS
### *Background: The Joseph Meli Fraud*

9.      Starting no later than early 2015 and continuing through January 2017, Meli controlled and operated multiple entities, including Advance Entertainment, LLC and other similar entities, which he claimed were companies with agreements to purchase large blocks of tickets to Broadway shows and other live events.  Meli enticed investors to pay Advance Entertainment, LLC and his similar entities tens of millions of dollars.

10.      Meli falsely represented to investors that he, directly or indirectly, would buy tickets with the investors' pooled money and then resell those tickets at higher prices for handsome investment returns.  In reality, Meli was misusing investor money.

11.      In or about January 2017, Meli was arrested by the Federal Bureau of

Investigation and charged by the United States Attorney's Office for the Southern District of New York with engaging in a scheme through Advance Entertainment, LLC and Meli's similar entities.

12.     Similarly, in or about January 2017, the Commission charged Meli, Advance Entertainment, LLC, and Meli's similar entities with fraud and froze assets associated with Meli's fraud.

13.     In October 2017, Meli pleaded guilty to engaging in a fraudulent ticket resale scheme through Advance Entertainment, LLC and his similar entities.

### *Siniscalchi and His Partners Rebrand Meli's Entities as Company A*

14.     In the wake of Meli's arrest, Siniscalchi, along with Company A's CEO and CFO, rebranded Meli's entities—with Meli's knowledge and help—in an effort to raise money from investors based on a pitch similar to the one Meli had made to his investors.

15.     To assist in the launch of Company A, Meli provided Siniscalchi and his Company A partners with copies of the documentation Meli had used to sign up investors in his prior ventures, including Advance Entertainment, LLC and Meli's similar entities:

      a.  In or about March 2017, Meli emailed various Advance Entertainment, LLC documents to Company A's CEO.  These documents included standardized investment agreements, or "Funding Agreements," between Advance Entertainment, LLC and its investors.

      b.  In or about May 2017, Meli emailed Siniscalchi various documents of another one of the entities Meli had used to perpetrate his fraudulent ticket resale scheme.  These documents included an executive summary, a standardized investment agreement, and a limited liability company agreement.

      c.  Later the same day in or about May 2017, Siniscalchi forwarded Meli's

documents to Company A's CEO with a subject line of "Useful Model Docs" and the message: "Enclosed are some docs I think you'll find useful as you set up your new entertainment venture."

16.     In May 2017, Company A's CFO formally established Company A. Siniscalchi subsequently became Company A's Chief Compliance Officer.

17.     At or about the same time, Company A began soliciting investors with an investment pitch that was much like the one Meli had employed prior to his January 2017 arrest. The gist of Company A's pitch was that Company A had special access to obtain large quantities of highly sought-after Broadway theater and sporting event tickets that could be resold for big profits.

18.     More specifically, Company A claimed to investors that Company A would pool investor funds and use them to purchase large blocks of tickets and to resell those tickets for a substantial markup.

19.     Company A's investment pitch, like those Meli had used previously, included specific written representations regarding the use of investors' money and the protection of the investors' interests, typically including Company A's representation that Company A (and its officers) would not make any money until investors had recouped at least most or all of their initial contributions. Company A additionally promised some investors to pay them an initial profit (which varied in percentage) before Company A would start to make any money.

20.     The documentation Company A provided to investors varied as to the specific profit-sharing terms promised to investors. For example, one Company A "Funding Agreement" with a particular investor provided:

"**<u>Allocation of Proceeds from Re-Sale of Tickets</u>**. [Company A] shall use his [*sic*] best efforts to resell the tickets for profit in good faith. The proceeds from the resale of the

Tickets will be distributed as follows:

>  a) First, 90% of all proceeds shall be allocated and distributed to Investor, and 10% shall be allocated and distributed to [Company A] until Investor has received 200% of its original investment;
>
>  b) Thereafter, there will be a 50-50 split of proceeds between Investor and [Company A]."

21.   Company A's representations about its business were essentially a reiteration of Meli's claims about Advance Entertainment, LLC and Meli's similar entities used to perpetrate the fraudulent ticket resale scheme that led to his January 2017 arrest and civil charges.

22.   As Siniscalchi knew, Meli was secretly involved in Company A's business from its inception, at which time the widely publicized civil and criminal cases against Meli were pending. Siniscalchi also knew that Meli's secret involvement continued even after Meli pled guilty to the criminal charges. Siniscalchi also understood that Meli expected to—and did—share in the money raised by Company A.

23.   To avoid scaring away investors, Siniscalchi took great pains to conceal Meli's involvement in Company A's business. Siniscalchi knew, or was reckless in not knowing, that Meli's continuing role with Company A following his arrest would have been important information that any reasonable investor would have wanted to know before parting with his/her money. Had investors known of Meli's involvement, they would have—at the very least—been alerted to the riskiness of investing in a business that was associated with an individual who had been charged with defrauding investors in a very similar business.

24.   To remind Company A personnel that Meli's involvement must be concealed from investors, Siniscalchi often referred to Meli as "Keyser Soze" (or simply "K"), in reference to the fictional movie character who secretly operated as a crime kingpin while disguising his

involvement.  Siniscalchi instructed Company A's staff not to include Meli on emails and other written communications to investors.

25.    Siniscalchi was vigilant in making sure Meli's role was concealed.  For example, on or about March 26, 2018, when an employee of Company A inadvertently included Meli's name on the "cc" line of an email to an individual investor, Siniscalchi wrote to Company A's CEO and CFO:

> "Guys – we potentially have a major [expletive] problem.  I haven't mentioned it to K [*i.e.*, Meli] yet but [the employee] accidentally put his name . . . in the email stream to [an investor]. . . . Do you have any idea how potentially catastrophic that could be?! . . . I'm sure it was a mistake, but Jesus . . . this is bad . . . really really bad.  You guys think I'm obsessive about security – this is why . . . . we need to be concerned about how to cope with the leak, and I've got to figure out how to get the info to K [*i.e.*, Meli] . . . ."

### Company A's Representations About the Use of Investor Money

26.    Company A raised at least approximately $2.7 million in net funds between approximately May 2017 and at least December 2017 from at least 12 investors, based on representations that the investors' money would be used to purchase blocks of tickets to at least four different live events: Harry Potter and the Cursed Child on Broadway, Hello Dolly on Broadway, Bruce Springsteen on Broadway, and an August 2017 professional boxing match between Floyd Mayweather Jr. and Conor McGregor.

27.    In collecting investments from various individuals, Company A provided documentation that reflected the essential terms of the original investment pitch.  In some instances, the terms were set forth in "Funding Agreements."  In other instances, following the formation of the Company A Investment Funds in August/September 2017, investors received private placement memoranda.

28.     For example, on or about June 7, 2017, Company A's CFO sent a Funding
Agreement to Investor-1 via email.  Company A's CFO represented to Investor-1, in pertinent
part, "[a]s you know, Company A does not get paid any management fee on [the purported ticket
deals] until tickets are sold and then the split is 90:10 in favour of the investor until 200% is
returned to the investor."

29.     The Funding Agreement specifically referred to Investor-1 as an "Investor" and
made clear that Investor-1's money would be used "to fund the purchase of [tickets] in exchange
for a sharing of proceeds from the re-sale of the Tickets."  Company A's Funding Agreements,
therefore, created investment contracts between Company A and its investors, including
Investor-1.

30.     On or about June 8, 2017, Investor-1 executed two Funding Agreements and
agreed to invest a total of $350,000 (investing $50,000 and $300,000 respectively).

31.     In the Funding Agreements, Company A represented that:

    a.     "[Company A] is in the business of purchasing and reselling concert, sports,
and theatrical tickets"; and

    b.     "[Company A] is currently in discussions with representatives, ticket holders,
and right's [sic] holders of: World Class Intellectual Properties, Top 50
Concert Touring Acts, and Mega Sporting Events.  The concert, sports and
theatrical tickets are all together referred to as 'The [Company A] Ticket
Inventory.'"

32.     Company A also promised Investor-1 that Company A would only be entitled to
use the $350,000 to "fund the purchase of [certain tickets] or selected segments of the [Company
A] Ticket Inventory in exchange for a sharing of proceeds from the re-sale of the Tickets" and
that "[Company A] . . . agree[d] to use invested funds to purchase at their sole discretion the

tickets identified in Exhibit A . . . ."  Exhibit A to Investor-1's Funding Agreements identified two sets of tickets: Harry Potter and the Cursed Child and Hello Dolly.

33.     Siniscalchi knew, or was reckless in not knowing, that Company A promised to use investor money exclusively to purchase tickets, and knew, or was reckless in not knowing, that those promises were false.

### *Siniscalchi Knowingly Misused Investor Funds*

34.     Company A claimed to its investors that it had a unique pipeline to certain ticket inventories.  But, Company A did not purchase tickets directly.  Instead, Siniscalchi acted as an intermediary between Company A and the supposed ticket inventory.  In particular, Siniscalchi represented that he could buy tickets, directly or indirectly, and that after doing so he would sell those tickets to Company A.  This arrangement was typically memorialized in a contract (*i.e.*, a "Letter Agreement").

35.     In particular, each time Company A and an investor or group of investors executed (or was expected to execute) a Funding Agreement, Company A also entered into a corresponding Letter Agreement with Siniscalchi.  On their face, the Letter Agreements created an arrangement, in substance, wherein Company A agreed to purchase—and Siniscalchi agreed to sell to Company A—a specified number of tickets at a cost that correlated with investment amounts per the investors' Funding Agreements.

36.     For example, on or about June 4, 2017, Company A entered into a Letter Agreement with a company called JJS Entertainment, LLC that corresponded with a Funding Agreement signed by Investor-1 in early June 2017.  The Letter Agreement stated, in pertinent part: "This Letter Agreement . . . is made by and between [COMPANY A] and JJS ENTERTAINMENT, LLC ('Seller') in order to facilitate [Company A]'s purchase of 'Tickets' . . . from Seller for Broadway performances of 'Harry Potter and the Cursed Child' . . . . Seller

has title to, or the unconditional right to obtain, the Tickets free and clear of any claim, lien or encumbrance and has the unqualified right to sell them to [Company A]."

37.    Siniscalchi was the sole owner and control person of JJS Entertainment, LLC. Siniscalchi signed the June 4, 2017 Letter Agreement as JJS Entertainment, LLC's Managing Member.

38.    Company A and JJS Entertainment, LLC entered into two similar Letter Agreements—with nearly identical language—on or about June 9, 2017, for the purchase of Hello Dolly tickets.  Like the June 4, 2017 Letter Agreement, the June 9, 2017 Letter Agreements corresponded with Funding Agreements signed by Investor-1 in early June 2017.

39.    Siniscalchi signed the June 9, 2017 Letter Agreements as JJS Entertainment, LLC's Managing Member.

40.    Siniscalchi was the sole signatory on the JJS Entertainment, LLC bank account into which Company A transferred Investor-1's money.

41.    As set forth in the Funding and Letter Agreements concerning Investor-1's investment, Siniscalchi was obligated to use the monies invested by Investor-1 only to purchase specified tickets.  And, Siniscalchi knew, or was reckless in not knowing, that he was obligated to use Investor-1's money (as was the case for all of Company A's investors) exclusively to purchase tickets.  But, in actuality, and as the examples below illustrate, Siniscalchi knowingly or recklessly misused the vast majority of the Investor-1's money, as well as money provided by other investors.

**Example #1**



**Example #2**



**Example #3**



42.     Overall, Siniscalchi, directly or indirectly, knowingly or recklessly misused the vast majority of the at least approximately $2.7 million net amount invested by at least 12 investors with Company A between approximately May 2017 and at least December 2017. Siniscalchi misappropriated more than half of the investor funds raised by Company A for his benefit and the benefit of Meli and Meli's family.  Siniscalchi misappropriated additional investor funds (a) to make payments to certain earlier investors in Ponzi-like fashion in order to conceal the fraud; and (b) to make payments to third parties who had no apparent connection to the ticket or entertainment industry.

### FIRST CLAIM FOR RELIEF
### FRAUD IN THE OFFER OR SALE OF SECURITIES
### (Violations of Section 17(a) of the Securities Act)

43.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-42 above.

44.     By reason of the conduct described above, the Defendant, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting with the requisite degree of knowledge or state of mind (i) employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (iii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

45.     By reason of the conduct described above, the Defendant violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

### SECOND CLAIM FOR RELIEF
### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
### (Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c))

46.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-42 above.

47.     By reason of the conduct described above, the Defendant, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a

fraud or deceit upon any persons, including purchasers or sellers of the securities.

48.     By reason of the conduct described above, the Defendant violated Exchange Act

Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)]

thereunder.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A.      Enter a permanent injunction restraining the Defendant and each of his officers,

agents, servants, employees, attorneys, and those persons in active concert or participation with

him who receive actual notice of the injunction by personal service or otherwise, including

email, fax, or overnight delivery service, from directly or indirectly engaging in the conduct

described above, or in conduct of similar purport and effect, in violation of:

> 1.     Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. 240.10b-5(a) and (c)]; and
> 2.     Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

B.      Order the Defendant to disgorge his ill-gotten gains, plus prejudgment interest;

C.      Order the Defendant to pay appropriate civil monetary penalties in accordance

with Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the

Exchange Act [15 U.S.C. § 78u(d)(3)];

D.      Retain jurisdiction over this action to implement and carry out the terms of all

orders and decrees that may be entered; and

E.      Grant such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.

Dated: April 29, 2019
       Boston, MA                  Respectfully submitted,

                                   SECURITIES AND EXCHANGE COMMISSION


                                   By its attorneys,

                                   /s/ Alicia M. Reed
                                   Alicia M. Reed (NY Bar # 4913596)
                                   Dahlia Rin* (MA Bar # 674137)
                                   Eric A. Forni* (MA Bar # 669685)
                                   Martin F. Healey* (MA Bar # 227550)
                                   U.S. Securities and Exchange Commission
                                   Boston Regional Office
                                   33 Arch St., 24th Floor
                                   Boston, MA 02110
                                   (617) 573-8827 (Forni)
                                   ForniE@sec.gov

                                   *Not admitted in the S.D.N.Y.